782 N.W.2d 882 (2010)
279 Neb. 820
STATE of Nebraska, appellee,
v.
Anthony A. CASILLAS, appellant.
No. S-09-660.
Supreme Court of Nebraska.
May 7, 2010.
*888 Dennis R. Keefe, Lancaster County Public Defender, and John C. Jorgensen for appellant.
Jon Bruning, Attorney General, and George R. Love, Columbus, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
McCORMACK, J.

NATURE OF CASE
Anthony A. Casillas was charged with driving under the influence, third offense, and with the aggravated crime of driving *889 with a concentration of more than .15 of 1 gram of alcohol per 210 liters of breath. Casillas was found drunk sitting on the driver's side of his parked vehicle after a 911 emergency dispatch call reported a similar vehicle being driven erratically in the same area. A Breathalyzer test showed a blood alcohol level of .267. Casillas' theory of defense at trial was that he was not operating his vehicle on the night in question, although, on appeal, he does not challenge the sufficiency of the jury's finding that he was. Casillas argues on appeal that the arresting officer's observations of his impairment should have been suppressed because they stemmed from an unlawful search and seizure, that his statements to the officer were made in violation of Miranda, and that the reliability of the horizontal gaze nystagmus (HGN) test conducted by the arresting officer should have been addressed in a separate evidentiary hearing before being allowed into evidence at trial. Casillas also challenges the jury instructions and asserts that his sentences were excessive.

BACKGROUND
On May 12, 2008, around 8:30 p.m., a woman driving north on 27th Street in Lincoln, Nebraska, became concerned about the vehicle in front of her. The witness testified that the vehicle, a blue Chevrolet pickup truck, was driving erratically and had driven up onto the curb a couple of times. The witness called 911 from her cellular telephone to report her observations to the police. Before losing sight of the truck, the witness saw it turn onto Y Street and then onto 28th Street. She could not identify the driver of the vehicle.
Officer Jon Rennerfeldt responded to the call and arrived at 28th and Y Streets at approximately 8:50 p.m. He saw a blue Chevrolet pickup truck parked along the curb on 28th Street, partially up the curb and on the grass. Casillas was sitting in the driver's seat. Rennerfeldt parked his police cruiser in the street and approached the truck on foot. He did not activate his police cruiser's overhead lights.
At trial, Rennerfeldt testified that as he approached, he observed exhaust coming from the tailpipe of the truck. He further testified that when he was near the truck, he saw the driver remove the keys from the ignition. On cross-examination, Rennerfeldt admitted that he had never before reported seeing exhaust coming from the tailpipe. He also admitted that in previous deposition testimony, he had said he did not recall for certain whether the truck was running when he approached.
Rennerfeldt testified that when he asked Casillas for his license, registration, and proof of insurance, Casillas "kind of slowly looked at me and said he didn't have a license, and he just kind of sat there" and did nothing. Rennerfeldt stated that he immediately noticed a strong odor of intoxicating beverage coming from the truck and from Casillas. He also noticed that Casillas' eyes were bloodshot and watery and that his speech was slurred. Rennerfeldt asked Casillas how much he had to drink, and Casillas replied, "too much." Defense counsel did not object at trial to this statement.
Rennerfeldt next testified that he asked Casillas to step out of the truck to assess his level of impairment. At this point, defense counsel made a continuing objection to Rennerfeldt's testimony based upon a pretrial motion to suppress, which was overruled. Rennerfeldt testified that as Casillas exited the truck, he attempted to steady his balance by grabbing onto the door. And as Casillas walked toward the sidewalk, he grabbed onto the side and back of his truck in order to keep his balance.
Over defense counsel's objection, Rennerfeldt testified that the first field sobriety *890 test he attempted to administer was the HGN test. Rennerfeldt was a 7-year veteran of the police force and testified that he is trained in detecting impairment through field sobriety tests, including the HGN test. Rennerfeldt testified specifically that he had attended a 24-hour class given by the Phoenix, Arizona, police department when he was an officer in Arizona. In that class, the HGN test was conducted in a "wet workshop," where test groups of people either had or had not consumed varying amounts of alcohol. He also attended training on HGN in Nebraska. Rennerfeldt explained that someone who is not under the influence will be able to smoothly track an object passed slowly from side to side, while a person under the influence exhibits jerky eye movements when attempting the same. Rennerfeldt explained that there are three phases to the HGN test. However, he was not able to get through the first phase of the test with Casillas because Casillas was not able to track the stimulus well enough. Rennerfeldt testified that while attempting the first phase, he observed a "very delayed" jerking of Casillas' eyes.
After the HGN test, Rennerfeldt asked Casillas to attempt the one-legged stand. As he instructed Casillas on the test, he observed Casillas swaying in a circular motion. After the explanation, Casillas told Rennerfeldt, "fuck this shit, man." Defense counsel did not specifically object to this statement. Rennerfeldt asked Casillas if he would like to try one more test, but Casillas refused.
Rennerfeldt took Casillas to a detoxification center to test his breath alcohol levels. Rennerfeldt is a licensed operator of the Intoxilyzer Model 5000 and conducted the test. Evidence was adduced at trial establishing the reliability of the machine used to test Casillas. At 10:08 p.m., the Intoxilyzer reported that Casillas had .267 grams of alcohol per 210 liters of breath.
At the close of the State's case in chief, defense counsel moved to dismiss. Counsel explained that there was no dispute that the Intoxilyzer score was significantly high and that .267 is over .08 and .15. But counsel argued that there was insufficient evidence that Casillas was operating the truck on the night in question. The court overruled the motion.
Casillas took the stand in his own defense. According to Casillas, he never drove that evening. He explained that he had driven his truck to a friend's house in the afternoon, but did not drive it after that time. Casillas testified that while at his friend's house, he had consumed 8 or 10 beers and innumerable shots of vodka. Casillas described his level of intoxication as a 7 on a 10-point scale and explained that he was drunk enough to be concerned that he might pass out. It was for that reason that he went to his truck. According to Casillas:
[I]n a moment I was kind of getting drunk and I state[d] to my friend that I'm going outside to get some fresh air. So I decided to go down to my truck because I said if I pass out, I don't want to pass out here outside of the apartment, you know. So I say I go to my truck and if I pass out, I pass out in my truck.
Casillas testified that when Rennerfeldt arrived, he was listening to music. He testified that his radio had an independent battery and that he never placed the keys in the ignition. Casillas' friend with whom he had been drinking did not testify at the trial. The jury found Casillas guilty of both charges.

PRETRIAL MOTIONS
Before the trial, defense counsel had unsuccessfully sought to exclude all evidence of Rennerfeldt's observations of and conversations with Casillas, as well as the *891 breath test results. At the pretrial hearing on his motions to suppress, defense counsel alleged that Rennerfeldt lacked reasonable suspicion or probable cause to stop Casillas. Defense counsel asserted there was nothing unusual about the fact that Casillas had parked his truck somewhat poorly alongside the curb, and he objected to Rennerfeldt's hearsay testimony concerning the 911 call. The caller did not appear for the suppression hearing, although she did testify at the trial.
The court also denied Casillas' motion to suppress statements made by Casillas during the stop on the grounds that they were involuntarily made and in violation of Miranda v. Arizona.[1] Rennerfeldt testified that he did not give Casillas Miranda warnings until he arrived at the detoxification center. The court found that Rennerfeldt's initial contact with Casillas was a first-tier encounter. Regardless, the court concluded that before making contact with Casillas, Rennerfeldt had both reasonable suspicion and probable cause based upon what he was told by his dispatcher and his observation that Casillas' truck was improperly parked. With regard to Casillas' statements to Rennerfeldt, the court concluded that they were voluntarily made despite the fact that Rennerfeldt likely made the decision to arrest Casillas when he asked Casillas to exit the vehicle. The court implicitly concluded that at the time of the statements, Casillas was not yet in custody.
Defense counsel had asked for an evidentiary hearing to challenge the reliability of the HGN test results before allowing that evidence at trial and had filed a motion in limine to exclude the HGN results. The court withheld its ruling on the motions until after the hearing on the motions to suppress. At the suppression hearing, Rennerfeldt was examined as to the foundation for the HGN test results. In addition to outlining his training and experience as he did at trial, Rennerfeldt expressed what he had been told concerning the scientific validity of the test. Rennerfeldt testified that he was not certain, but he believed that nystagmus occurred naturally in less than 3 percent of the population. Rennerfeldt testified that according to the National Highway Traffic Safety Administration, however, such naturally occurring nystagmus was never observable. Accordingly, he did not believe that the HGN test had any official margin of error.
On cross-examination, Rennerfeldt elaborated that his training in Arizona involved, in addition to the first wet workshop, 3 months of field training, where a log was kept to test his accuracy at predicting whether the subject was over the legal limit based on the HGN test. Arizona required a 90-percent accuracy rate of such predictions with a minimum of 35 subjects and then required attendance at a second wet workshop before an officer was considered proficient at conducting the test. Rennerfeldt stated that he has continued to keep a field log of the accuracy of his HGN testing, which he had in his possession, but defense counsel did not inquire further, and the log was not entered into evidence. Rennerfeldt admitted that he had not personally participated in the development of any standardized field sobriety tests, including HGN.
After the hearing, defense counsel argued that Rennerfeldt's testimony failed to adequately demonstrate the reliability of the HGN test. After giving the parties time to brief the matter, the court denied defense counsel's request for any further evidentiary hearing on the validity of the HGN test. The court also denied defense counsel's motion in limine to exclude the test. The court noted that Rennerfeldt *892 had demonstrated he had experience and training in conducting the test, and there was no evidence presented by defense counsel suggesting the need for an evidentiary hearing. The court concluded that "the HGN test does not warrant a Schafersman [v. Agland Coop[2]] analysis."

JURY INSTRUCTIONS
Defense counsel objected to the jury instructions to the extent that they did not require the jury to unanimously determine that Casillas had a blood alcohol level greater than .08 before considering the question of whether his blood alcohol content was greater than .15. The instructions given stated that the jury could reach one of three possible verdicts: (1) not guilty, (2) guilty of driving under the influence of alcoholic liquor, or (3) guilty of driving under the influence of alcoholic liquor and driving while having a concentration of .15 of 1 gram or more by weight of alcohol per 210 liters of breath. The jury was instructed that in order to find Casillas guilty of driving under the influence, it must find either that he was actually under the influence of alcoholic liquor or that he had a concentration of .08 of 1 gram or more by weight of alcohol per 210 liters of his breath while operating a motor vehicle. The jury was instructed that it need not agree unanimously on whether Casillas was guilty by virtue of being under the influence or by virtue of having an alcoholic liquor concentration of .08. But if it found Casillas guilty of driving under the influence, it must then decide whether the State proved, beyond a reasonable doubt, the additional element that at the time Casillas was operating a motor vehicle, he had a concentration of .15 of 1 gram or more by weight of alcohol per 210 liters of breath.
Defense counsel's proposed instruction stated in relevant part:
Only if you agree unanimously that the state proved beyond a reasonable doubt that ... Casillas had a concentration of eight-hundredths (.08) of one gram or more by weight of alcohol per two hundred ten (210) liters of his breath, need you then decide whether the state has proven beyond a reasonable doubt that... Casillas had a concentration of fifteen-hundredths (.15) of one gram or more by weight of alcohol per two hundred ten (210) liters of his breath....

SENTENCES
After the jury's guilty verdict, the trial court sentenced Casillas to 360 days' imprisonment and a 15-year license revocation. The court explained that imprisonment was necessary for the protection of the public because the risk was substantial that during any period of probation, Casillas would engage in additional criminal conduct. The court stated further that lesser sentences would depreciate the seriousness of Casillas' crimes and promote disrespect for the law.

ASSIGNMENTS OF ERROR
Casillas argues that the trial court erred in (1) ruling that HGN testing does not warrant analysis under Schafersman v. Agland Coop[3] and permitting such evidence and testimony at trial, (2) overruling his motions to suppress the traffic stop and all evidence obtained therefrom, (3) overruling his motion to suppress statements made following the traffic stop, (4) refusing to give his proposed instructions, and (5) imposing excessive sentences.

*893 STANDARD OF REVIEW
In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[4]
The standard for reviewing the admissibility of expert testimony is abuse of discretion.[5] We review the record de novo to determine whether a trial court has abdicated its gatekeeping function when admitting expert testimony.[6]
An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[7]
In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[8]
Whether jury instructions given by a trial court are correct is a question of law.[9]

TRAFFIC STOP
Casillas argues that all of the evidence relating to the evening in question should have been suppressed because it was obtained by an illegal search and seizure. Casillas' argument is based on the premise that Rennerfeldt's act of walking toward Casillas' parked vehicle was a seizure under the Fourth Amendment. And, according to Casillas, Rennerfeldt lacked reasonable suspicion to make such a seizure, because the court should have disregarded the 911 dispatch call as unreliable and as inadmissible hearsay.
Without lending any credence to Casillas' argument regarding the weight to be given the dispatch call, we find no merit to his conclusion that before Rennerfeldt had reached the driver's-side window, Casillas had been stopped for purposes of the Fourth Amendment. Rather, we agree with the trial court that Rennerfeldt and Casillas were involved in a tier-one encounter.
A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.[10] A tier-one police-citizen encounter involves the voluntary cooperation of the citizen elicited through non-coercive questioning and does not involve any restraint of the liberty of the citizen involved.[11]
Rennerfeldt approached Casillas on foot. He did not turn on the overhead lights of *894 his police cruiser. Rennerfeldt did not interfere with Casillas' prior activity of sitting in the truck. Instead, he asked for identification and posed a few questions to Casillas. We have explained that a seizure does not occur simply by reason of the fact that a police officer approaches an individual, asks him or her for identification, and poses a few questions to that individual, so long as the officer does not indicate that compliance with his or her request is required and the questioning is carried on without interrupting or restraining the person's movement.[12]
The cases upon which Casillas relies, State v. Pickinpaugh[13] and State v. Benson,[14] involved drivers whose vehicles were pulled over by law enforcement. Such is not the case here. In this case, there has been no restraint of movement, and thus, there was no detention or seizure. If there is no detention or seizure within the meaning of the Fourth Amendment to the U.S. Constitution, then the Fourth Amendment safeguard against an unreasonable search and seizure is not implicated and reasonable suspicion is not required.[15]
Only when Casillas was asked to step out of his truck and submit to field sobriety tests did the encounter rise to a tier-two investigatory stop as defined by Terry v. Ohio.[16] At that point, however, it is uncontested that Rennerfeldt had reasonable suspicion that criminal activity was afoot. Not only was Rennerfeldt privy to the 911 dispatch call, but he testified that he observed Casillas' truck parked partially up the curb and on the grass and that the truck was running. Rennerfeldt also testified that he observed indicia of impairment through Casillas' speech and odor and that Casillas told Rennerfeldt he had had too much to drink. Thus, we agree with the trial court that the evidence obtained from Casillas was not the product of an illegal search and seizure.

MIRANDA
Casillas next argues that the trial court erred in admitting Rennerfeldt's testimony concerning statements he made on the evening in question. According to Casillas, he was effectively "in custody" for purposes of Miranda and, since he was not advised of his Miranda rights at that time, the statements were inadmissible. The only statements presented to the jury were Casillas' statements that he had too much to drink and that he did not wish to continue with the field sobriety tests.
As already discussed, the most damaging of the statements  that he had too much to drink  was uttered during a tier-one encounter while Casillas was being informally questioned as he sat in his vehicle. Thus, Miranda does not apply. But neither does Miranda apply to Casillas' statements made during the field sobriety testing. Persons temporarily detained pursuant to an investigatory traffic stop are not "in custody" for the purpose of Miranda.[17] Temporarily detaining a driver to submit to routine field sobriety tests does not ordinarily rise to the level of custody so as to implicate Miranda.[18] *895 While Casillas asserts that Rennerfeldt made the decision to arrest Casillas before the statements were made, we find this point irrelevant. The officer's unexpressed thoughts have no impact on whether a reasonable person would feel free to leave. Rennerfeldt's behavior toward Casillas during the field sobriety testing indicated a merely temporary detention. We find that neither of Casillas' statements were subject to Miranda and were thus properly admitted at trial.

HGN TEST
Casillas' principal argument regarding the admission of evidence against him focuses on the HGN test. Casillas argues that HGN involves scientific testimony and should have been subjected to a hearing under Daubert v. Merrell Dow Pharmaceuticals, Inc.,[19] and Schafersman v. Agland Coop[20] before being presented to the jury. According to Casillas, Rennerfeldt's own testimony at the suppression hearing called into question the factual basis, data, principles, and application of the HGN testing of Casillas, and the trial court erred in placing the burden upon Casillas to present evidence of unreliability before a Daubert/Schafersman hearing would even be conducted.
We agree that the trial court failed to carry out its gatekeeping duties under Daubert/Schafersman. But we note at the outset that the admission of Rennerfeldt's testimony concerning the HGN test was harmless. In a jury trial of a criminal case, harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant.[21] In this case, even though the HGN test carried the weight of scientific evidence, it was presented as but a small part of Rennerfeldt's observations which led him to conclude that Casillas was intoxicated. The Breathalyzer test results confirmed these observations. We conclude that the jury's determination that Casillas was operating a vehicle with at least .15 of 1 gram of alcohol per 210 liters of breath was unattributable to the admission of the HGN test results.
Nevertheless, we will discuss the trial court's error in order to provide future guidance for the courts and how the trial court erred in this case. Neb. Rev. Stat. § 27-702 (Reissue 2008) states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Under the principles set forth in Daubert[22] and Schafersman,[23] the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion.[24] The purpose of the gatekeeping *896 function is to ensure that the courtroom door remains closed to "junk science" that might unduly influence the jury, while admitting reliable expert testimony that will assist the trier of fact.[25] As stated in Daubert, "`Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.'"[26]
Before Daubert and Schafersman, this gatekeeping function was carried out in Nebraska trial courts under the principles of Frye v. United States.[27] In Frye, the single question that determined admissibility was whether the evidence had become generally accepted in its field.[28] After Daubert/Schafersman, the question became whether the evidence was reliable. Several nonexclusive factors are considered in making this determination: (1) whether a theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique enjoys general acceptance within a relevant scientific community.[29]
The intent of Daubert was to be more in keeping with the "`liberal thrust'" of the Federal Evidence Rules and their general approach of relaxing the traditional barriers to opinion testimony  to let in good science before it became generally accepted.[30] But, in some instances, Daubert can be more conservative. It might preclude the admission of evidence that would have been accepted under Frye because, while most science generally accepted in the relevant scientific community will be good science, it is not necessarily so.[31]
Because the court must independently evaluate whether the evidence is based in good science, Daubert is generally considered to have imposed a more rigorous gatekeeper function on trial courts than Frye did.[32] And the trial court does not have the discretion to abdicate its gatekeeping duty.[33] "[U]nder the Daubert/Schafersman ... framework, the burden to weed out unreliable expert testimony is placed directly on the trial court."[34] Before admitting any expert opinion testimony, the trial court must determine whether the expert's knowledge, skill, experience, training, and education qualify the witness as an expert.[35] If the opinion involves scientific or specialized knowledge, trial courts must also determine whether the reasoning or methodology underlying the expert's opinion is scientifically valid.[36] In order to properly conduct appellate review, it is the duty of *897 the trial court to adequately demonstrate by specific findings on the record that it has performed its gatekeeping functions.[37]
All specialized knowledge falls generally under the rules of Daubert/Schafersman. HGN involves scientific knowledge.[38] Thus, the trial court erred insofar as it indicated that HGN fell outside of Daubert/Schafersman. But even as to specialized evidence, what specific duties Daubert/Schafersman impose depends on the circumstances. A pretrial hearing under Daubert/Schafersman is not always mandated, and the extensiveness of any such hearing is left to the discretion of the trial court.[39]
It also appears from the trial court's order that it denied a hearing, because Casillas did not present affirmative evidence of unreliability to trigger it. We have said that the initial task falls on the party opposing expert testimony to sufficiently call into question its reliability.[40] However, we have never said that the initial burden to produce evidence disproving reliability is upon the opponent. And even if we had, it is unclear how the opponent would present such evidence if not in a hearing. Fundamentally, it is always the burden of the proponent of the evidence to establish the necessary foundation for its admission, including its scientific reliability under Daubert/Schafersman.[41]
To sufficiently call specialized knowledge into question under Daubert/Schafersman is to object with enough specificity so that the court understands what is being challenged and can accordingly determine the necessity and extent of any pretrial proceeding.[42] Assuming that the opponent has been given timely notice of the proposed testimony, the opponent's challenge to the admissibility of evidence under Daubert should take the form of a concise pretrial motion. It should identify, in terms of the Daubert factors, what is believed to be lacking with respect to the validity and reliability of the evidence and any challenge to the relevance of the evidence to the issues of the case. In order to preserve judicial economy and resources, the motion should include or incorporate all other bases for challenging the admissibility, including any challenge to the qualifications of the expert.[43]
In this case, Casillas pointed out in his motion in limine that the State had presented no evidence as to the underlying reliability of the HGN test  that there was a complete absence of foundation for its admission. Specifically, Casillas made a particular point of the fact that there was no reliable evidence on the margin of error *898 for the test and the rate of naturally occurring nystagmus. Although Rennerfeldt testified as to his personal testing of HGN in his training classes and while on the job, such experience did not establish, by scientific method, the correlation between nystagmus and intoxication levels.[44] And he was unable to testify with any degree of certainty as to the margin of error. Rennerfeldt, while qualified to testify that he properly conducted the test, was unqualified to establish its underlying reliability. The State did not attempt to present any further documentary or testamentary evidence relevant to any of the Daubert/Schafersman factors.
Granted, as we have said, courts need not reinvent the wheel each time that specialized evidence is adduced.[45] The proponent need not continuously go through the exercise of re-proving reliability of the same evidence in every case. Instead, once a Nebraska trial court has actually examined and assessed the reliability of a particular scientific wheel under Daubert, and its determination has been affirmed on appeal, then other courts may simply take judicial notice and ride behind.[46] In such cases, the proponent establishes a prima facie case of reliability by relying on precedent, and the burden shifts to the opponent to show that recent developments raise doubts about the validity of previously relied-upon theories or techniques.[47]
The State points out that HGN testing is not novel to this or any other court and that it is generally found to be admissible.[48] HGN testing has not been affirmed in Nebraska since we adopted the Daubert test. So the trial court could not have taken judicial notice of precedent to satisfy its gatekeeping findings. Even if such precedent had existed, Casillas was never put on notice that by virtue of precedent, the burden had shifted to him.
Because scientific acceptance remains an important factor under Daubert/Schafersman, the State can rely, in part, on our case law under Frye in making its prima facie case. But a history in this jurisdiction of prior acceptance under Frye does not relieve the trial courts of their fundamental gatekeeping duties or the proponent of its burden to lay foundation under Daubert/Schafersman. It is not the opponent's burden to come forth with evidence proving a negative.[49] Only once a prima facie case of reliability has been presented, does the burden shift.[50] As the court in Weinberg v. Geary[51] explained:
Of course, the proponent of the evidence must establish at least a minimal foundation for receipt of the expert opinion. When he does so the burden of coming forward shifts to the opponent of the *899 evidence, ordinarily through the use of preliminary questions, to attack the basis for receiving the evidence.
To the extent that the trial court in this case placed the initial burden upon the opponent of the evidence and concluded that HGN was not a Daubert/Schafersman issue, it erred. Again, given the overwhelming evidence of intoxication well above .15 and the minimal role that the HGN test played in Rennerfeldt's evaluation, we conclude that the error was harmless.

JURY INSTRUCTIONS
We next address the jury instructions. In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.[52] We understand Casillas' argument regarding the jury instructions to be that the jury had to first determine, unanimously, that Casillas had a breath alcohol content of over .08 before determining, unanimously, that he had a breath alcohol content of over .15. Casillas acknowledges that a driving-under-the-influence offense can generally be shown either by evidence of physical impairment and well-known indicia of intoxication or simply by excessive alcohol content shown through a chemical test and that the jury need not be unanimous in its determination of under which means the offense was committed.[53] But Casillas asserts that when the jury must subsequently consider the aggravated offense of being over .15, then such an instruction is inappropriate. Casillas argues that it was inappropriate and inconsistent for the court not to require a unanimous decision that Casillas' blood alcohol level was greater than .08 before determining, unanimously, that his blood alcohol level was greater than .15. This is so because, otherwise, the jury might convict him of being over.15 when it never agreed he was over .08. We find no merit to this argument. If the jury unanimously agrees that Casillas had a breath alcohol content of over .15, then it also unanimously agrees that Casillas had a breath alcohol content of at least .08.

EXCESSIVE SENTENCES
Finally, Casillas argues that his sentences were excessive. Casillas notes that he expressed remorse and a desire to overcome his substance abuse. In addition, an offender selection worksheet indicated that Casillas would be suitable for intensive supervision probation. After the jury's guilty verdict, the trial court sentenced Casillas to 360 days' imprisonment and a 15-year license revocation.
When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the violence involved in the commission of the crime.[54] In imposing a sentence, the sentencing court is not limited to any mathematically applied set of factors.[55] The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.[56]
*900 Having reviewed the trial record and the presentence investigation report, we find no evidence that the court imposed excessive sentences. The court explained that imprisonment was necessary for the protection of the public because the risk was substantial that during any period of probation, Casillas would engage in additional criminal conduct. This was not an unreasonable conclusion given the extent of Casillas' intoxication and the fact that this was his third offense. The court further stated that lesser sentences would depreciate the seriousness of Casillas' crimes and promote disrespect for the law. We find no error.

CONCLUSION
For the foregoing reasons, we affirm the judgment of the trial court.
AFFIRMED.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Schafersman v. Agland Coop, 262 Neb. 215, 631 N.W.2d 862 (2001).
[3] Id.
[4] State v. Daly, 278 Neb. 903, 775 N.W.2d 47 (2009).
[5] State v. Edwards, 278 Neb. 55, 767 N.W.2d 784 (2009).
[6] Id.
[7] State v. Daly, supra note 4.
[8] State v. Scheffert, 279 Neb. 479, 778 N.W.2d 733 (2010).
[9] State v. Bormann, 279 Neb. 320, 777 N.W.2d 829 (2010).
[10] State v. Soukharith, 253 Neb. 310, 570 N.W.2d 344 (1997).
[11] See State v. Hedgcock, 277 Neb. 805, 765 N.W.2d 469 (2009).
[12] See id.
[13] State v. Pickinpaugh, 17 Neb.App. 329, 762 N.W.2d 328 (2009).
[14] State v. Benson, 198 Neb. 14, 251 N.W.2d 659 (1977).
[15] See State v. Soukharith, supra note 10.
[16] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). See, also, State v. Royer, 276 Neb. 173, 753 N.W.2d 333 (2008).
[17] See State v. Bowers, 250 Neb. 151, 548 N.W.2d 725 (1996).
[18] See id. See, also, e.g., Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); State v. Bayer, 229 Or.App. 267, 211 P.3d 327 (2009); Thomas v. State, 294 Ga.App. 108, 668 S.E.2d 540 (2008); State v. Warren, 957 A.2d 63 (Me.2008); Brown v. State, 171 Md.App. 489, 910 A.2d 571 (2006); State v. Mellett, 642 N.W.2d 779 (Minn.App. 2002); State v. Garbutt, 173 Vt. 277, 790 A.2d 444 (2001).
[19] See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[20] See Schafersman v. Agland Coop, supra note 2.
[21] State v. Ford, 279 Neb. 453, 778 N.W.2d 473 (2010).
[22] Daubert v. Merrell Dow Pharmaceuticals, Inc., supra note 19.
[23] Schafersman v. Agland Coop, supra note 2.
[24] Zimmerman v. Powell, 268 Neb. 422, 684 N.W.2d 1 (2004).
[25] Adesina v. Aladan Corp., 438 F.Supp.2d 329 (S.D.N.Y.2006).
[26] Daubert v. Merrell Dow Pharmaceuticals, Inc., supra note 19, 509 U.S. at 595, 113 S.Ct. 2786.
[27] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).
[28] See Schafersman v. Agland Coop, supra note 2.
[29] See, e.g., State v. Daly, supra note 4.
[30] Daubert v. Merrell Dow Pharmaceuticals, Inc., supra note 19, 509 U.S. at 588, 113 S.Ct. 2786.
[31] Schafersman v. Agland Coop, supra note 2.
[32] See State v. Coon, 974 P.2d 386 (Alaska 1999).
[33] See Zimmerman v. Powell, supra note 24.
[34] Id. at 428, 684 N.W.2d at 8.
[35] King v. Burlington Northern Santa Fe Ry. Co., 277 Neb. 203, 762 N.W.2d 24 (2009).
[36] Id.
[37] See id. See, also, Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).
[38] See, e.g., Commonwealth v. Sands, 424 Mass. 184, 675 N.E.2d 370 (1997) (and cases cited therein). But see Hulse v. State, Dept. of Justice, 289 Mont. 1, 961 P.2d 75 (1998).
[39] See State v. Daly, supra note 4.
[40] State v. Kuehn, 273 Neb. 219, 728 N.W.2d 589 (2007). See, also, State v. Davlin, 272 Neb. 139, 719 N.W.2d 243 (2006); State v. Mason, 271 Neb. 16, 709 N.W.2d 638 (2006).
[41] See, Bourjaily v. United States, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); King v. Burlington Northern Santa Fe Ry. Co., supra note 35; State v. Mason, supra note 40. See, also, U.S. v. Nacchio, 555 F.3d 1234 (10th Cir.2009); U.S. v. Frazier, 387 F.3d 1244 (11th Cir.2004); U.S. v. Mooney, 315 F.3d 54 (1st Cir.2002); Moore v. Ashland Chemical Inc., 151 F.3d 269 (5th Cir.1998); In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717 (3d Cir.1994).
[42] See, State v. Mason, supra note 40. See, also, State v. Kuehn, supra note 40; Kinney v. H.P. Smith Ford, 266 Neb. 591, 667 N.W.2d 529 (2003).
[43] 60 Am.Jur. Trials 1 § 19 (1996).
[44] See State v. Borchardt, 224 Neb. 47, 395 N.W.2d 551 (1986), overruled on other grounds, State v. Baue, 258 Neb. 968, 607 N.W.2d 191 (2000).
[45] State v. Mason, supra note 40.
[46] See Stovall v. State, 140 S.W.3d 712 (Tex. App.2004).
[47] See Schafersman v. Agland Coop, supra note 2.
[48] State v. Baue, supra note 44; State v. Borchardt, supra note 44. See, generally, 5 David L. Faigman et al., Modern Scientific Evidence: The Law and Science of Expert Testimony § 41:8 (2009). See, also, State v. Daly, supra note 4.
[49] Craig ex rel. Craig v. Oakwood Hosp., 471 Mich. 67, 684 N.W.2d 296 (2004).
[50] See, Hoult v. Hoult, 57 F.3d 1 (1st Cir. 1995); Michael J. Saks, Expert Admissibility Symposium: Reliability Standards  Too High, Too Low, or Just Right? 33 Seton Hall L.Rev. 1167 (2003).
[51] Weinberg v. Geary, 686 N.E.2d 1298, 1301 (Ind.App.1997).
[52] State v. Vela, 279 Neb. 94, 777 N.W.2d 266 (2010).
[53] See, e.g., State v. Kuhl, 276 Neb. 497, 755 N.W.2d 389 (2008).
[54] State v. Rung, 278 Neb. 855, 774 N.W.2d 621 (2009).
[55] Id.
[56] Id.