IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. YANGA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

EMMANUEL S. YANGA, APPELLANT.

Filed June 14, 2016.    No. A-15-483.

Appeal from the District Court for Lancaster County: STEVEN D. BURNS, Judge. Affirmed.

Douglas L. Kerns for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

PIRTLE and RIEDMANN, Judges.

PIRTLE, Judge.

## I. INTRODUCTION

Emmanuel Yanga was charged with five criminal offenses arising from an incident which occurred in the early morning hours of September 21, 2014. Following a jury trial, he was found guilty on all counts, and he now appeals each of the resulting convictions and sentences. For the reasons that follow, we affirm.

## II. BACKGROUND

Yanga was charged with two counts of attempted assault in the second degree, one count of use of a deadly weapon to commit a felony, one count of criminal mischief, over $1,500, and one count of assault in the third degree following events which took place at approximately 4:30 a.m. on September 21. Trial took place on March 2, 3, and 4, 2015.

- 1 -

Yanga and Mazaher Bakry had dated for almost three years, but the relationship ended in February 2014. Bakry testified that at approximately 9:30 p.m. on September 20, Bakry and her son went to a birthday party at Bakry's sister's home. Bakry's car was not available so she needed a ride to and from the party. Tombe Ladu attended the same party and when the party ended at about 4 a.m., he agreed to give Bakry, her son, and another woman a ride home. Ladu testified that he had noticed a blue car following him very closely on the drive from the party, so much so that the lights in the rear view mirror were blinding him. He testified that he knew Yanga as they were part of the South Sudanese community, and he had recognized the blue car belonged to Yanga.

The other woman was dropped off first, and when Ladu arrived in the parking lot of Bakry's apartment complex, Bakry saw Yanga's car leaving the complex. Ladu stopped in front of Bakry's apartment building door. Bakry saw Yanga make a U-turn and return toward the apartment parking lot. Yanga parked his car and approached the door of Ladu's car before Bakry was able to exit. Yanga called Bakry insulting names and told her that he was not going to leave her. Bakry exited the car and told Yanga he should leave her alone. Yanga attempted to slap Bakry with his hand and she threatened to call the police. Yanga kept talking to Bakry as she led her son into the apartment building.

Ladu was still in his car, and noticed that Bakry had left the car door open, so he exited the car to close the door, intending to leave. As Ladu was re-entering his car, Yanga returned and kicked him while also threatening him. Ladu told Yanga that he was going to call the police, but as he took his phone out of his pocket, Yanga slapped the phone out of his hand and crushed it on the ground. At that time, Bakry called the police and informed Yanga she was doing so. Yanga responded that he did not care, and continued to yell at Bakry. Yanga told Bakry "he was not a chicken" and that he would be back, then left in the same direction that he came from. Bakry was on the phone with the police at the time and informed the dispatcher that Yanga had just left. She was told to call back if Yanga returned.

As Ladu picked up his phone from where it had been damaged, Yanga was returning to the parking lot. Bakry testified that Yanga had been gone for approximately a minute and a half. At that time Bakry and Ladu were standing behind Ladu's car and Bakry shouted for Ladu to move. Ladu observed Yanga's car approaching at a high rate of speed and could hear the engine accelerating. Bakry reached out and literally pulled Ladu between two parked cars stating they just barely got out of the way of Yanga's car. Bakry heard Yanga's car collide into Ladu's car and several other parked cars. Ladu's car, a 2008 Chrysler 300 was hit with enough force that it moved from its parked position and the airbags were deployed inside of Yanga's vehicle.

Yanga struggled away from the inflated air bags and went after Bakry and Ladu, who both fled. Yanga caught up to Ladu and placed him in a "headlock" as they fell to the ground. Ladu, in response, was able to "pin" Yanga, although Yanga struggled, punching Ladu in the head. Ladu said he was crying because it hurt so much and his arms were weak. Meanwhile, Bakry called the police again and when they arrived, Yanga was placed under arrest.

Ladu testified that after this confrontation with Yanga his knees were bruised, he had pain in his left elbow and right arm, and pain in his head. Ladu testified that it cost him $287 to repair the damage Yanga caused to his phone. He also testified that his automobile insurance carrier

valued the damage to his car at approximately $12,000. Ladu was reimbursed for about $11,500 of the damage, after a $500 deductible was subtracted.

Officer Tyler Nitz of the Lincoln Police Department was dispatched to Bakry's apartment complex at about 4:40 a.m. on September 21. He was on his way there when dispatch advised that one of the parties left in a blue Mazda and was likely headed for West A Street. He tried to locate the car, but was unsuccessful. Dispatch advised that the Mazda had returned and Nitz hurried back to the apartment complex. When he arrived, he observed that Officer Kevin Meyer was on top of Yanga and Yanga was taken into custody. Meyer told Nitz that Yanga was actively fighting Ladu when he arrived and Nitz observed that Yanga was yelling and aggressive. As Nitz escorted Yanga to his cruiser, Yanga appeared very emotional and upset, but he cooperated in walking to the car. Nitz testified that Yanga was calling Bakry and Ladu names, was trying to slip out of the handcuffs, and was kicking at the cruiser door once he was seated inside.

Yanga volunteered that he was involved in the altercation and stated that he was defending himself. Yanga told Nitz that his head hurt, and Nitz observed that there had been a "pretty significant" car accident, so Nitz took Yanga to the hospital. At the hospital, Yanga was uncooperative and aggressive, and he was handcuffed to the bed. The wheels of the heavy, motorized bed were locked, but Yanga still drug it around the room. It was determined that Yanga was too aggressive to be tested, and he was mildly sedated. Yanga admitted to consuming alcohol earlier in the evening, and Nitz smelled a moderate odor of alcohol emanating from him.

Meyer testified that when he arrived at the apartment complex Bakry directed him to where Yanga and Ladu were fighting. He observed Ladu on top of Yanga, trying to keep Yanga from hitting him, and Meyer split the two men up. Meyer conducted an accident investigation after observing several damaged cars in the parking lot. He created a diagram to help explain his testimony, showing there were four separate points of impact on three parked cars, as well as Ladu's car. Ladu's car left several feet of skid marks after it was struck. Meyer observed that Ladu was upset, afraid, crying and shaking, and Ladu told him that he was in fear for his life at the time of the incident.

Paula Gottier, a resident of the apartment complex testified that she was awakened by people yelling outside of her window at 4:30 a.m. on September 21. From her window, she observed three people standing by cars in the parking lot, then one person sped away in a blue Mazda. Soon after, she witnessed the Mazda returning to the parking lot traveling "quite a bit faster" than the speed normally driven in a parking lot. She saw that there were two people in the parking lot between the parked cars. She observed that the Mazda was angled toward the parked cars, not traveling in the direction that cars normally drive, and she saw it hit other cars in the lot. She did not see any brake lights or hear screeching of brakes prior to the impact.

Brian Sloan testified that his 2010 Chevrolet Silverado pickup truck was damaged on September 21. He testified that he paid about $1,100 to get the damage fixed.

Kyle Sawyer testified that his "brand new" 2013 Kia Rio had no damage on September 20. However when he woke on September 21, there was damage to the rear bumper, trunk, and driver's side rear quarter panel. He testified that it cost approximately $1,500 to get his car repaired. He was responsible for a $500 deductible while his automobile insurance company paid the rest.

Michael Peirce testified that on September 20 his 2001 Ford Mustang was in good condition, with no damage to the rear bumper or anywhere else. It was also damaged on September 21. At the time of trial he had yet to repair his vehicle.

After the State rested, Yanga moved for a directed verdict on all five counts. Yanga argued that with respect to the criminal mischief charge, the State had not shown that Yanga intentionally or maliciously intended to cause damage to anyone's property, and the State improperly aggregated the damages of the victims to reach a level of pecuniary loss totaling over $1,500. The district court overruled the motion.

During the jury instruction conference Yanga's counsel renewed the argument that it was improper for the State to aggregate and to list alternate victims in Count IV of the information. The court overruled the motion for directed verdict.

With respect to Count IV, the jury instructions included a provision that the State must prove beyond a reasonable doubt that "a. Emmanuel S. Yanga intentionally damaged property of Tombe Ladu, Brian Sloan, or Kyle Sawyer" and that he did so on or about September 21, 2014. Counsel did not specifically object to the portion of instruction IV which named multiple property damage victims in Count IV. Yanga objected to Count IV, Instruction IV, as counsel stated "it's our position it should not be instructed to the jury itself." Counsel also objected to the same instruction requesting that the jury should be instructed that criminal mischief may be either intentional or malicious. The State indicated it wanted to proceed only on whether the crime was committed intentionally, and the court overruled Yanga's objection.

Yanga also objected to jury instruction number 11 with regard to whether Officer Meyer was an expert witness. The district court found it was a "close call" but thought the officer who prepared the diagram of the movement of the vehicles did something that not everyone else is able to do. The court stated that while Meyer may not be an expert in the "classical sense," he did have specialized training and thought the expert instruction was warranted.

The jury was instructed and shortly thereafter, the jury asked two questions. First, the jury asked whether it should add the sum of the damages of all of the vehicles together, or treat them separately, and second, whether the measure of damages should be the out of pocket expenses or the total value of the damage to the vehicles. The district court proposed that the jury be told to calculate the damage resulting from Yanga's intentional act, and that pecuniary loss should be calculated based on the loss experienced by someone other than Yanga from damage to the property owned by Ladu, Sloan, or Sawyer. Yanga's counsel stated "Without waiving any of the objections or arguments I made before with respect to Count IV, I have no objections to the Court's answers to their questions."

Yanga was convicted on all five counts by the jury. On May 6, 2015 Yanga was sentenced. Yanga denied all responsibility for any of the crimes and asserted that Ladu was the guilty party. He was sentenced to 20 to 36 months' imprisonment for Counts I, II, and IV, each of which were Class IV felonies. Yanga was sentenced to 2 to 3 years' imprisonment for Count III, a Class II felony, and 180 days for Count V, a Class I misdemeanor. Counts I, II, III, and IV were to be served consecutively and Counts IV and V were ordered to be served concurrent to one another and consecutive to any other sentence served by Yanga. Yanga was given credit for 225 days already served. Yanga now appeals his convictions and sentences.

## III. ASSIGNMENTS OF ERROR

Yanga asserts the district court erred by: (1) giving jury instructions that were inappropriate under the circumstances or were unconstitutionally vague, (2) overruling his motion for directed verdict and failing to dismiss each of the charges against him, (3) failing to dismiss the charges against him because the State presented inconsistent theories, (4) overruling defense objections and the errors at trial had the cumulative effect of violating his right to a fair trial, and (5) imposing excessive sentences.

## IV. STANDARD OF REVIEW

A defendant challenging a jury instruction on appeal has the burden to show that the instruction prejudiced him or otherwise adversely affected his substantial rights. *State v. Loyuk,* 289 Neb. 967, 857 N.W.2d 833 (2015). In a challenge to a jury instruction on appeal, all jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *Id.*

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Merchant,* 288 Neb. 439, 848 N.W.2d 630 (2014).

In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, as such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Wells,* 290 Neb. 186, 859 N.W.2d 316 (2015).

An appellate court will not disturb a sentence imposed within statutory limits absent an abuse of discretion by the trial court. *State v. Hunnel,* 290 Neb. 1039, 863 N.W.2d 442 (2015).

## V. ANALYSIS

### 1. JURY INSTRUCTIONS

#### (a) Pecuniary Loss

In his assignment of error regarding the jury instructions, Yanga asserts §28-519, the statute upon which the criminal mischief charge was based, is unconstitutionally vague. To raise a valid challenge to the constitutionality of a statute, a litigant is required to properly raise and preserve the issue before the trial court. *Clark v. Tyrrell,* 16 Neb. App. 692, 750 N.W.2d 364 (2008). Yanga did not challenge the constitutionality of § 28-519 until the present appeal. Because this issue was not raised in the trial court, it is not properly before this court and we will not address this assertion of unconstitutional vagueness.

Yanga also asserts the district court erred in instructing the jury regarding the measurement of pecuniary loss for the charge of criminal mischief. In a challenge to a jury instruction on appeal, all jury instructions must be read together, and if, taken as a whole, they correctly state the law,

are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *State v. Loyuk,* supra.

"Pecuniary loss" was defined in jury instruction VII as "monetary loss suffered by another as a result of the defendant's conduct which causes the damage." The Nebraska Supreme Court has defined "pecuniary loss," as used in § 28-519 as "monetary loss suffered by another as a result of the defendant's conduct which constitutes criminal mischief under § 28-519." *State v. Pierce,* 231 Neb. 966, 439 N.W.2d 435 (1989)(distinguished on other grounds). See also *State v. Flye,* 245 Neb. 495, 413 N.W.2d 526 (1994). Thus, instruction VII is consistent with the definition cited by the Nebraska Supreme Court.

Yanga specifically asserts that giving this instruction was in error as the instruction and the verdict form did not specify whether the loss was to one person, or to multiple other persons. Yanga argues the jury had difficulty "determining the amount of damages and whether they should measure damages according to each alleged victim, or to the single charge." He asserts that in prior cases involving criminal mischief, the defendants were alleged to have caused damage to only one other person's property. In contrast, in this case, the "property of another" could be interpreted to include multiple parked cars damaged simultaneously as part of Yanga's one act. Interestingly though, Yanga does not cite us to any case law, either in Nebraska or elsewhere, that would support this argument.

When Yanga was charged, the State alleged Yanga caused a pecuniary loss of $1,500 or more to "Tambe Ladu and/or Brian Sloan and/or Kyle Sawyer and/or Michael Peirce." The evidence shows Yanga caused two losses to Ladu; the cost to repair his phone and the cost of the damage caused to his car. Ladu testified that it cost $287 to repair his phone and, that after a $500 deductible was subtracted, his insurance company reimbursed him for approximately $11,500. Brian Sloan, Kyle Sawyer, and Michael Peirce testified regarding the damage caused to their vehicles. Sloan testified that repair of his vehicle cost $1,100, and Sawyer testified that repair of his vehicle cost $1,500. Sawyer testified that he was reimbursed by his insurance company for $1,000 after a $500 deductible was subtracted.

The statutes and relevant case law are focused on the amount of damage caused, not the ownership of the damaged property. See *State v. Flye,* supra, (specific ownership of property is not an essential element of criminal mischief and is immaterial except to identify the property in question as not that of the accused). The function of "pecuniary loss in relation to the crime of criminal mischief is establishment of the grade of the offenses to determine which punishment or penalty may be imposed on conviction for criminal mischief." *State v. Pierce,* 231 Neb. at 972, 439 N.W.2d at 441 (1989). Although pecuniary loss is not an essential element or constituent of the criminal conduct called "criminal mischief," pecuniary loss is important in the prosecution for criminal mischief because under the statute, the greater the extent of pecuniary loss, the more severe the punishment which may be imposed on conviction. *Id.* If "another" is taken to mean one or more persons, Yanga's one act caused sufficient pecuniary loss to far exceed the $1,500 threshold for the criminal mischief charge.

The damage caused by Yanga to Ladu alone was also sufficient to exceed the threshold for the criminal mischief charge. In *State v. Pierce,* supra, the Nebraska Supreme Court stated that in a case of criminal mischief based on intentional or reckless damage to another's property, "the

State's prima facie case would have to include evidence of the reasonable cost of repair and market value for the damaged property," which can include personal property and real property. *Id.* at 974, 439 N.W.2d at 442. Ladu's insurance company reimbursed him for approximately $11,500, after a $500 deductible was subtracted and he testified that this sum was paid for the damages to his vehicle. Clearly, the damage caused to Ladu's vehicle was in excess of the $1,500 threshold for the criminal mischief charge.

Applying either interpretation of the word "another," as used in §28-519, the damage Yanga caused met the requirements of the statute to convict him for criminal mischief. The jury instructions, when read together correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence. Thus, we find there was no prejudicial error necessitating reversal. See *State v. Loyuk,* supra.

(b) Expert Testimony

Yanga asserts the district court erred in giving jury instruction 11 at trial, as he asserts Officer Kevin Meyer was not properly qualified as an expert. He specifically argues that the jury instruction is improper "when the court does not comply with the requirements of *Schafersman."* See *Schafersman v. Agland Coop,* 262 Neb. 215, 631 N.W.2d 862 (2001)). Instruction 11 states:

> A witness who has special knowledge, skill, experience, training, or education in a particular area may testify as an expert in that area. You determine what weight, if any, to give to an expert's testimony just as you do with the testimony of any other witness. You should consider the expert's credibility as a witness, the expert's qualifications as an expert, the sources of the expert's information, and the reasons given for any opinions expressed by the expert.

The proposed instruction was reproduced verbatim from the Nebraska Jury Instructions Second Criminal edition and there is little question that it was a correct statement of the law. See *State v. Loyuk, supra.* However the question is whether instruction was warranted by the evidence presented. Yanga's objection to the proposed instruction was overruled as the court found the officer "may not be an expert in the classical sense" but that the officer had special training to prepare a diagram of the movement of the vehicles involved.

In *Schafersman,* supra, the Nebraska Supreme Court held that the admissibility of expert opinion testimony under the Nebraska Rules of Evidence should be determined based upon the standards first set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, (1993). Under *Daubert,* and *Schafersman,* the trial court acts as a gatekeeper to ensure the evidentiary relevance of an expert's opinion, to ensure that the courtroom door remains closed to "junk science" that might unduly influence the jury, while admitting reliable expert testimony that will assist the trier of fact. *State v. Casillas,* 279 Neb. 820, 782 N.W.2d 882 (2010). Before admitting any expert opinion testimony, the trial court must determine whether the expert's knowledge, skill, experience, training, and education qualify the witness as an expert. *Id.* If the opinion involves scientific or specialized knowledge, the trial courts must also determine whether the reasoning or methodology underlying the expert's opinion is scientifically valid. The Nebraska Supreme Court has stated that to sufficiently call specialized knowledge into question under

*Daubert/Schafersman* is to object with enough specificity that the court understands what is being challenged and can accordingly determine the necessity and extent of any pretrial proceeding. See *State v. Casillas, supra*. Yanga did not object to Meyer's testimony regarding his training and expertise at trial.

Further, the Nebraska Supreme Court has stated that "courts need not reinvent the wheel each time that specialized evidence is adduced." *State v. Casillas, supra.* "Once a Nebraska trial court has actually examined and assessed the reliability of a particular scientific wheel under *Daubert,* and its determination has been affirmed on appeal, then other courts may simply take judicial notice and ride behind." *Id.*

Accident reconstruction has long been accepted in Nebraska as scientifically based and grounded before and after the *Daubert* standard was adopted. Officer Meyer testified to his training and experience as an officer, how accidents are investigated, his personal experience in responding to the disturbance in this case and the resulting investigation. He also testified regarding the computer-generated diagram that he prepared in this case. Yanga did not object to this testimony.

On appeal, Yanga argues that even though Meyer did not testify as to whether he thought the crash was accidental or intentional, the inclusion of the instruction added "unwarranted weight to his testimony," thus the instruction was erroneous and prejudiced his defense. The instruction given allowed the jury to consider whether the officer was an expert and "what weight, if any, to give to an expert's testimony" just as the jury would with the testimony of any other witness. We find instruction 11 was appropriate under the circumstances and was not prejudicial, and the district court did not err in giving it.

## 2. MOTION FOR DIRECTED VERDICT

Yanga asserts the district court erred in overruling his motion for directed verdict, and in not dismissing each of the counts against him. He asserts the evidence submitted at trial was insufficient to conclude he was guilty beyond a reasonable doubt, and that no reasonable trier of fact could find that the State had met its burden of proof.

In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Elseman,* 287 Neb. 134, 141, 841 N.W.2d 225, 232 (2014). After reviewing the evidence with regard to each charge, we find the district court did not err in overruling Yanga's motion for directed verdict.

### (a) Counts I and II

Yanga asserts that his charges for attempted assault in the second degree should have been dismissed because "neither of the alleged victims were injured, and the testimony of witnesses support that they did not even run when Yanga [sic] car approached." An 'attempt' charge means a person can be convicted even if the act is not completed. The record shows that Yanga drove a motor vehicle directly toward two people, and that if Bakry had not pulled Ladu out of the way, one or both individuals would have been hit. This fulfills the "attempt to cause serious bodily

injury" element of attempted second degree assault. The district court did not err in overruling Yanga's motion for directed verdict.

### (b) Count III

To be considered by an appellate court, an error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Obad v. State,* 277 Neb. 866, 766 N.W.2d 89 (2009).

Yanga does not argue that his vehicle was not a deadly weapon, but rather focuses on the lack of serious bodily injury as discussed above. Because he has not specifically assigned and specifically argued this error, we will not address it.

### (c) Count IV

Yanga asserts the charge for criminal mischief should have been dismissed because the State did not meet its burden to show that Yanga intended to damage the property of the victims, or that the pecuniary loss was $1,500 or more. Having determined, above, that the State met its burden to show Yanga caused pecuniary loss of $1,500 or more, we must now determine whether the State met its burden to show that the damage was caused intentionally.

Yanga argues that it is unclear what caused him to strike the vehicles, and the "circumstantial evidence of the crash and the possibility of a motive because of the prior arguments with the alleged victims do not support a finding of intent to damage the parked vehicles, particular those of Sloan and Sawyer."

At trial, he argued there was no evidence showing that he intentionally or maliciously intended to cause damage to anyone's property, as any "incidental contact" with the other cars was not intentional, and since he did not know the owners of the other cars, it was not malicious.

Criminal mischief includes intentionally, recklessly, or maliciously damaging the property of another. The evidence in this case shows Yanga caused damage to the property of several individuals while in the commission of attempted second degree assault. The evidence shows Yanga followed Ladu and Bakry to Bakry's apartment. He berated Bakry, and engaged in an argument and a physical altercation with Ladu. Yanga got into his car and left the area, but turned around and drove back directly toward Ladu and Bakry. Bakry told Ladu to move, but he did not, so she grabbed him and pulled him between two cars for safety. Yanga struck Ladu's car, and the vehicles of Peirce, Sloan, and Sawyer. Witnesses testified that Yanga's blue Mazda returned at a high rate of speed and was aimed at parked cars where people do not normally drive. The witnesses did not see any brake lights, or hear the screeching of brakes prior to the impact. There is sufficient evidence to support a finding that Yanga's intentional or malicious decision to drive toward Bakry and Ladu while they were in such close proximity to the personal property of others supports a finding that he intentionally, recklessly, or maliciously damaged the property of others. Thus the district court did not err in overruling Yanga's motion for directed verdict, and the district court was correct in not dismissing this charge.

(d) Count V

Yanga asserts there was insufficient evidence to support his conviction for third degree assault of Ladu. He argues there is "no evidence apart from the testimony of Ladu that Ladu suffered any injuries, and none to suggest that Ladu had been threatened before holding Yanga immobile on the ground."

A conviction for third degree assault requires that the defendant intentionally, knowingly, or recklessly cause bodily injury to another person or threaten another in a menacing manner. Ladu testified that he tried to run from Yanga, but Yanga caught up to him and hit him. Ladu testified that he subdued Yanga, but Yanga continued to hit him in the head while on the ground. He testified that his knees were bruised and that he had pain in his left elbow, right arm, and in his head from where Yanga hit him. Bodily injury is defined as "physical pain, illness, or any impairment of physical condition." See Neb. Rev. Stat. § 28-109. (Reissue 2008) Upon our review, we find the court did not err in overruling Yanga's motion for directed verdict, as the victim's testimony was sufficient to convict Yanga of third degree assault.

3. INCONSISTENT THEORIES

Yanga asserts the district court erred by not dismissing Counts I, II, III, and IV on the basis that the State argued inconsistent theories, resulting in a violation of his due process rights. He asserts he could not possess the intent to cause bodily injury to Bakry and Ladu, as well as the intent to damage the property of Sloan or Sawyer. He states the State proceeded on a theory of two mutually exclusive crimes, "insofar as a defendant's intent could be one or the other but not both -- either Yanga intended to cause bodily harm, or he intended to damage the vehicles of individuals whom he did not know."

Yanga does not explain why these theories are inconsistent. It is possible for a person to decide to attempt to hit another person with a car, and for that person to decide to do so even if it meant crashing into nearby parked cars. The State's theories are not inconsistent, and we find this assignment is meritless.

4. DEFENSE OBJECTIONS

Yanga asserts the district court erred in "overruling defense objections to questions by the State, and the cumulative effect of these and other enumerated errors in the district court amount to a violation of [his] right to a fair trial." He argues that where "any one of several errors assigned would not in itself be sufficient to warrant a reversal, nonetheless, if all of them in the aggregate justify a conclusion that the defendant was not accorded a fair trial," then it is the duty of the court to award a new trial. See *Wamsley v. State,* 171 Neb. 197, 106 N.W.2d 22 (1960).

An argument that does little more than to restate an assignment of error does not support the assignment and an appellate court will not address it. *State v. Mata,* 275 Neb. 1, 745 N.W.2d 229 (2008). Yanga does not elaborate as to which defense objections he believes should have been sustained, therefore we decline to address this assignment of error.

## 5. EXCESSIVE SENTENCE

Yanga asserts the district court imposed an excessive sentence which was unwarranted by the evidence at trial and at sentencing. An appellate court will not disturb a sentence imposed within statutory limits absent an abuse of discretion by the trial court. *State v. Hunnel,* supra.

Yanga was sentenced to 20 to 36 months' imprisonment for Counts I, II, and IV, each of which were Class IV felonies. Under Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014), the maximum penalty for a Class IV felony is 5 years' imprisonment or a $10,000 fine, or both. Yanga was sentenced to 2 to 3 years' imprisonment for Count III, a Class II felony, and 180 days for Count V, a Class I misdemeanor. The maximum sentence for a Class II felony is 50 years' imprisonment. Neb. Rev. Stat. § 28-105. (Cum. Supp. 2014) The maximum penalty for a Class I misdemeanor is one year imprisonment or a $1,000 fine, or both. Neb. Rev. Stat. § 28-106. (Cum. Supp. 2014) Counts I, II, III, and IV were to be served consecutively and Count IV and V were ordered to be served concurrent to one another and consecutive to any other sentence served by Yanga. Each of the sentences imposed are within the statutory limits.

Yanga asserts the acts for which he was charged happened "nearly contemporaneously" and no one was seriously injured. He argues this fact, coupled with his "limited criminal history and mitigating factors present in the Presentence Investigation, argue in favor of a reduced sentence." Yanga does not discuss the factors he believes would justify a reduced sentence or argue how the district court abused its discretion in imposing an allegedly excessive sentence. Therefore we decline to address this assignment of error and affirm the sentences imposed by the district court. See *State v. Mata,* supra.

## VI. CONCLUSION

We find the district court did not err by overruling Yanga's motion for directed verdict. The district court did not err by finding the jury instructions given were appropriate and that there was sufficient evidence to support the charges against Yanga. We find the district court did not abuse its discretion by imposing sentences which were well within the statutory limits. Errors not specifically assigned and specifically argued, or not properly raised before the district court were not considered on appeal.

AFFIRMED.

BISHOP, Judge, participating on briefs.