IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. REMIJIO

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JOHN REMIJIO, APPELLANT.

Filed March 21, 2017.    No. A-16-561.

Appeal from the District Court for Sarpy County, PAUL D. MERRITT, JR., Judge, Retired, on appeal thereto from the County Court for Sarpy County, TODD J. HUTTON, Judge. Judgment of District Court affirmed.

Patrick J. Boylan, Deputy Sarpy County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy, for appellee.

MOORE, Chief Judge, and INBODY and RIEDMANN, Judges.

MOORE, Chief Judge.

## INTRODUCTION

John Remijio appeals an order of the district court for Sarpy County affirming his conviction and sentence in the county court for driving under the influence of alcohol and reckless driving. On appeal, Remijio argues that the county court erred in denying a motion to suppress evidence seized as the result of his arrest. Specifically, Remijio asserts that the court erred in approving police use of a citizen to retrieve him from his home, in order for police to interrogate him without a proper *Miranda* warning and seize physical evidence without a warrant. Finding no merit to the assigned errors, we affirm.

FACTUAL BACKGROUND

During the early evening hours of September 27, 2014, Deputy Adam Vail of the Sarpy County Sheriff's Department was training Deputy Cody Schramm when they received a radio broadcast concerning a maroon Ford F-150 pickup truck driving on its rims. Schramm, who was driving, headed to the neighborhood from which the report originated. Vail testified that when they arrived in the area, an anonymous citizen standing outside stopped the deputies and reported seeing the F-150 driving on its rims. The citizen instructed the deputies regarding the direction taken by the vehicle. Schramm similarly testified that the deputies asked neighbors who were standing outside their homes if they had seen the F-150, and they pointed out the direction taken by the vehicle.

Continuing in the reported direction, the deputies found a vehicle matching the description, a maroon F-150 with two flat tires on the passenger side, parked diagonally, partially on the grass and partially on the driveway of a residence, which was later determined to be Remijio's residence. A couple other cars were parked in the driveway. Schramm parked the police cruiser in the street in front of the residence, partially blocking the driveway. Vail believed a car could have backed out of the driveway if necessary. A small group of people were outside the house. Vail made contact with the group outside the house and asked them who owned the F-150. In response, Vail was informed that the owner of the F-150 was inside the house. Vail asked that someone go inside and get that individual and bring him or her outside, so the deputies could speak with that person. One of the individuals outside the house, Victoria Foote, retrieved Remijio from the house. Foote was Remijio's girlfriend.

Vail was in uniform with badge displayed, armed with a gun, and he arrived in a marked police cruiser. Vail testified that he did not order anyone from the group to retrieve the driver. Instead, he "asked" if someone would get the driver. Foote lived with Remijio at the residence in question. Foote testified that she had returned home from shopping when the deputies arrived. As she was exiting her vehicle, the deputies pulled up behind her, partially blocking the driveway. She stated that the deputies seemed friendly and were not yelling when they approached her. The deputies asked her who owned the F-150. Foote reported the F-150 as belonging to Remijio. When asked whether she felt compelled to retrieve Remijio in accordance with the deputies' request, Foote claimed she was not going to argue with the deputies, so she did feel compelled. During cross-examination, Foote acknowledged that the deputies did not force or demand that she retrieve Remijio, and they did not have their weapons drawn. Rather, the deputies politely asked if Foote would retrieve the owner of the F-150. However, Foote qualified this statement by reiterating that "when a police officer asks me to do something, I'm going to do it."

When Remijio came outside, Vail requested that he stand in front of the cruiser. As Remijio approached them, the deputies detected the odor of alcohol coming from his person, and observed Remijio to have bloodshot, watery eyes and his speech to be slurred. The deputies asked Remijio several questions regarding his identity, the condition of the F-150, and whether he had been drinking and driving the vehicle that evening. In response to these questions, Remijio acknowledged owing and driving the F-150, drinking earlier in the day, and not having anything to drink since arriving at the house approximately 15 minutes earlier. Vail testified that during this

questioning, Remijio was not handcuffed or under arrest, and he was free to leave. Vail indicated that he did not force Remijio to answer any questions, and that his responses were voluntary.

Vail questioned Remijio further regarding the two flat tires. Remijio claimed to not remember how this occurred. Shortly following this comment, Vail requested Schramm to begin the preliminary breath test observation time. During the waiting period, Schramm continued questioning Remijio and Vail talked with the other people outside the house to determine if Remijio had been driving the vehicle. The group informed Vail that Remijio was the driver of the F-150. Vail returned to Schramm and Remijio. Schramm then advised Vail that Remijio denied driving the F-150, having changed his story. Vail reminded Remijio of his earlier statement that he had been driving and had nothing to drink since returning home. Remijio responded by shrugging his shoulders, giving no verbal response. Schramm thereafter advised Remijio of his *Miranda* rights. Remijio indicated that he understood his *Miranda* rights. After the advisement, Remijio said he was willing to talk with the deputies without an attorney present. The deputies proceeded to question him further.

In response to further questioning, Remijio testified that he starting drinking about 4:00 p.m. that day and had gone in his truck to get more beer at a grocery store. This conversation occurred at approximately 7:15 p.m. Remijio was then asked to perform field sobriety tests. The results of the tests revealed impairment. Remijio was then asked to submit to a preliminary breath test, which he failed. He was then arrested for driving under the influence, and transported to the Sarpy County Jail. There he was administered a DataMaster test, which reported a blood alcohol content of .272, above the legal limit.

PROCEDURAL BACKGROUND

On October 27, 2014, a complaint was filed against Remijio, charging him with (1) driving under the influence of alcohol .15 or over, second offense, in violation of Neb. Rev. Stat. § 60-6,196 (Reissue 2010), a Class I misdemeanor; and (2) reckless driving, in violation of Neb. Rev. Stat. § 60-6,213 (Reissue 2010), a Class III misdemeanor.

On February 23, 2015, Remijio filed a motion to suppress all evidence seized as a result of the "stop and arrest." Remijio argued that there was no probable cause supporting the arrest, there was no warrant, the deputies did not observe him driving the vehicle, and that the arrest violated his constitutional rights.

On May 11, 2015, a hearing was held on the motion to suppress before the county court. During this hearing, Vail, Schramm, and Foote testified as set forth above. Several exhibits were admitted into evidence, including video recorded from the cruiser, arrest and sobriety test reports, and the record of Remijio's prior driving under the influence conviction.

On July 14, 2015, the county court entered an order denying the motion to suppress. The court found Vail had authority to pursue an investigation based on the radio broadcast and neighbor's tip regarding the manner in which the F-150 was being operated. The court thereafter found that the circumstantial evidence supported suspicion that the F-150 located at Remijio's residence was the same vehicle previously witnessed to be traveling nearby in a reckless manner. Upon locating the vehicle, the court found Vail could lawfully stop and briefly detain Remijio, as the identified owner and possible driver, for investigative purposes, as Vail had articulable facts

giving rise to a reasonable suspicion that Remijio had unlawfully driven the F-150 recklessly and with flat tires. The court found that having Remijio complete the field sobriety tests did not amount to an arrest but was more akin to a *Terry* stop. Prior to the completion of the tests, the court determined that Remijio was not in custody, and that his statements were noncustodial and admissible at trial. The court also found that "the test results themselves are non-testimonial and do not require *Miranda* even though (Schramm) read (Remijio) the *Miranda* warning prior to (Remijio's) participation in the tests and he waived the same." The court concluded Remijio was not arrested until he failed the field sobriety tests and that there was probable cause to make the arrest.

On October 15, 2015, a stipulated bench trial was held before the county court, during which Remijio preserved his motion to suppress. The parties stipulated that the testimony at the suppression hearing would be the same testimony offered at trial. The State offered into evidence police reports, as well as the test results. On October 19, the county court found Remijio guilty of driving under the influence of alcohol .15 or over and reckless driving.

On October 22, 2015, an enhancement and sentencing hearing was held. The State offered evidence that Remijio had a prior conviction for driving under the influence, making the charge in the present case a second offense. The court sentenced Remijio to a period of 18 months' probation, and imposed a $1,000 fine for driving under the influence and a $100 fine for reckless driving.

Remijio appealed his conviction to the district court. Remijio alleged within his statement of errors that (1) the police created a custodial setting by ordering Foote to make Remijio come out of his house and answer their questions about an anonymous tip they received that he was driving a pickup in a haphazard manner, (2) the police heightened the custodial setting by directing Remijio where to stand when he was brought out of his home, (3) once in custody the police failed to advise Remijio of his *Miranda* rights before they elicited incriminating statements, (4) the subsequent *Miranda* advisement did not cure the illegal questioning that preceded it and ultimately led to his arrest, (5) the police had no probable cause to arrest Remijio or even summon him from his home because nothing the anonymous tipster told them amounted to a crime, and (6) the physical and testimonial evidence was the fruit of the poisonous tree of an illegal arrest and should have been suppressed.

On May 3, 2016, the district court entered an order affirming the judgment of the county court and finding all of Remijio's claimed errors to be without merit.

First, the district court noted the county court's determination that the deputies had a reasonable suspicion that reckless driving, at a minimum, had occurred, and the investigation based on this suspicion was reasonable. Considering the totality of the circumstances, the district court found such a determination to be not clearly erroneous, and the deputies were justified in pursuing their investigation and making initial contact with Remijio.

Second, the district court held that a tier-one police-citizen encounter occurred when Remijio exited the residence and made initial contact with the deputies to answer questions concerning the F-150, which encounter did not amount to a seizure under the Fourth Amendment. The court determined that once the deputies developed a reasonable suspicion that Remijio had been driving under the influence, supported by the totality of the circumstances, and began pursuing a DUI investigation, the encounter became a tier-two police-citizen encounter, invoking

the protections of the Fourth Amendment. Applying these protections, the court found the pursuit of a driving under the influence investigation to have been reasonable based on the information available to the deputies. The court found the warrantless arrest to be appropriate as a result of the sobriety tests reflecting impairment.

Lastly, the court addressed Remijio's assertion that the deputies failed to timely advise him of his *Miranda* rights. The court found that Remijio was not in custody prior to being advised of the *Miranda* rights by Schramm. Therefore, no advisement was necessary during the initial encounter.

Remijio subsequently perfected this appeal.

## ASSIGNMENTS OF ERROR

Remijio assigns, combined and restated, that the district court erred in affirming the county court's denial of his motion to suppress.

## STANDARD OF REVIEW

In an appeal of a criminal case from the county court, the district court acts as an intermediate court of appeals, and its review is limited to an examination of the record for error or abuse of discretion. *State v. Avey*, 288 Neb. 233, 846 N.W.2d 662 (2014). Both the district court and a higher appellate court generally review appeals from the county court for error appearing on the record. *Id.* When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id*. But an appellate court independently reviews questions of law in appeals from the county court. *Id*. When deciding appeals from criminal convictions in county court, an appellate court applies the same standards of review that it applies to decide appeals from criminal convictions in district court. *Id*.

In reviewing a trial court's ruling on a motion to suppress, whether based on a claimed violation of the Fourth Amendment or on a statement's alleged involuntariness, an appellate court applies a two-part standard of review. Regarding historical facts, the appellate court reviews the trial court's findings for clear error. Whether those facts meet constitutional standards, however, is a question of law, which the appellate court reviews independently of the court's determination. *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013). See also, *State v. Woldt*, 293 Neb. 265, 876 N.W.2d 891 (2016).

## ANALYSIS

Remijio argues that the county court erred in overruling the motion to suppress, thereby approving police use of a citizen to retrieve him from his home in order for police to interrogate him without a proper *Miranda* warning and seize physical evidence without a warrant. As a result, Remijio asserts that his incriminating statements and other seized evidence was inadmissible.

To determine whether an encounter between an officer and a citizen reaches the level of a seizure under the Fourth Amendment to the U.S. Constitution, an appellate court employs the analysis set forth in *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993), which describes

the three levels, or tiers, of police-citizen encounters. *State v. Gilliam*, 292 Neb. 770, 874 N.W.2d 48 (2016).

A tier-one police-citizen encounter involves the voluntary cooperation of the citizen elicited through noncoercive questioning and does not involve any restraint of liberty of the citizen. Because tier-one encounters do not rise to the level of a seizure, they are outside the realm of Fourth Amendment protection. *Id*.

A tier-two police-citizen encounter constitutes an investigatory stop as defined by *Terry v. Ohio*, 392 U.S. 1 (1968). Such an encounter involves a brief, nonintrusive detention during a frisk for weapons or preliminary questioning. *Id*. A tier-three police-citizen encounter constitutes an arrest. An arrest involves a highly intrusive or lengthy search or detention. *Id*. Tier-two and tier-three police-citizen encounters are seizures sufficient to invoke the protections of the Fourth Amendment to the U.S. Constitution. *Id.*

A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave. *Id*.

Whether a police officer has a reasonable suspicion based on sufficient articulable facts necessary to authorize stopping a person depends on the totality of the circumstances. Courts must determine whether reasonable suspicion exists on a case-by-case basis. *State v. Lamb*, 280 Neb. 738, 789 N.W.2d 918 (2010). See, also, *State v. Wollam*, 280 Neb. 43, 783 N.W.2d 612 (2010). Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause. *State v. Nelson*, 282 Neb. 767, 807 N.W.2d 769 (2011).

The factual basis for an investigatory stop need not arise from the officer's personal observation, but may be supplied by information acquired from another person. *State v. Ege*, 227 Neb. 824, 420 N.W.2d 305 (1988). When the information providing the factual basis for an investigatory stop is furnished by another person, it must contain sufficient indicia of reliability. *State v. Pickinpaugh*, 17 Neb. App. 329, 762 N.W.2d 328 (2009). A detailed eyewitness report of a crime by an informant provides its own indicia of reliability because a citizen informant who has personally observed the commission of a crime is presumed to be reliable. *Id*.

### FOOTE'S COOPERATION WITH DEPUTIES

Remijio argues that he was removed from his residence by an agent of law enforcement, transforming his contact with the deputies into a tier-three encounter and thereby amounting to a seizure sufficient to invoke the protections of the Fourth Amendment. Remijio's arguments are based upon his assertion that Foote was intimidated by the deputies to retrieve Remijio from his residence, qualifying Foote's actions as taken on behalf of law enforcement.

To determine whether a private person's search is actually a search by the state depends on whether the private person must be regarded as having acted as an instrument or agent of the state. *State v. Abdouch*, 230 Neb. 929, 434 N.W.2d 317 (1989). Resolution of whether an individual is acting as an agent of law enforcement is a question of fact determined by the totality of the circumstances. *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448, (2003), *overruled on other grounds*.

The defendant has the burden of establishing that a private individual acted as an agent of law enforcement. *Id.*

Upon our review, we find no clear error by the county court, as affirmed by the district court, in the determination that Foote was not acting as an agent of law enforcement. The record supports a finding that Foote was not ordered by the deputies to bring Remijio outside, or otherwise intimidated to do so. Rather, Foote's testimony reflected that the deputies were friendly and polite in their request, and that Foote simply cooperated with their request to ask the driver to come outside. While Foote testified that she was not going to argue with the deputies, this is not equivalent to being forced to act. Further, the deputies' act of pulling up behind Foote's parked vehicle was not sufficiently intimidating to create a forced agency relationship. The totality of the circumstances indicate that Foote's cooperation was voluntary.

Remijio has failed to satisfy his burden of proving Foote acted as an agent of law enforcement. Remijio's first interaction with law enforcement occurred upon exiting the residence and speaking with the deputies. Therefore, we proceed to consider whether this initial interaction between Remijio and the deputies amounted to seizure under the Fourth Amendment and custodial interrogation pursuant to *Miranda*.

INITIAL INTERACTION

Remijio argues that the district court erred in finding that his exit from the residence amounted to a tier-one police-citizen encounter and that this encounter was non-custodial, thereby not requiring the advisement of *Miranda* rights.

Upon our review, we find that the district court did not err in determining that the initial contact between Remijio and the deputies qualified as a tier-one police-citizen encounter, not reaching the level of a seizure under the Fourth Amendment. The deputies were investigating reports of possible reckless driving when they made contact with Remijio. Remijio voluntarily cooperated with the deputies' request to approach the cruiser and answer some questions. The questioning occurred in a public place and involved noncoercive inquiries pertaining to Remijio's identity, the condition of the F-150, and whether Remijio had been drinking and driving. The location of Remijio during this questioning, between the deputies and the cruiser, did not amount to a restraint of liberty sufficient to elevate the initial encounter to a higher tier. The surrounding circumstances reflect that Remijio was not compelled by the deputies to answer their questions, but instead voluntarily made incriminating responses. This initial encounter and questioning was not a seizure sufficient to invoke the protections of the Fourth Amendment.

CONTINUED DETENTION

We further agree with the district court that once the deputies began pursuing a driving under the influence investigation, a tier-two police-citizen encounter was present sufficient to invoke the protections of the Fourth Amendment. The interaction at this point was elevated to a "nonintrusive detention," synonymous with an investigatory stop as defined by *Terry v. Ohio*, 392 U.S. 1 (1968).

While an investigatory stop is considered a "seizure" and invokes Fourth Amendment safeguards, because of its less intrusive character, it requires only that the stopping officer have

specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime. *Wollam*, 280 Neb. at 50. See, also, *State v. Au*, 285 Neb. 797, 829 N.W.2d 695 (2013).

We conclude that the deputies were aware of specific and articulable facts sufficient to give rise to reasonable suspicion that Remijio had been driving recklessly and under the influence, so as to justify the additional detention and investigation. During the initial contact with Remijio, the deputies detected the odor of alcohol coming from his person. Further, Remijio had bloodshot, watery eyes and slurred speech. Thereafter, Remijio's voluntary statements acknowledged ownership of the vehicle, driving the vehicle, drinking earlier in the day, and having nothing to drink since returning to the residence 15 minutes earlier. Thus, the deputies' suspicions that Remijio had been driving under the influence were reasonable under the totality of the circumstances to support the continued *Terry* investigation through the field sobriety tests and further questioning. See *State v. Pickinpaugh*, 17 Neb. App. 329, 762 N.W.2d 328 (2009) (field sobriety tests may be justified by a police officer's reasonable suspicion based upon specific articulable facts that the driver is under the influence of alcohol).

Upon our review of the record, the factual findings of the county court were not clearly erroneous, and the lower courts did not err in finding no Fourth Amendment violations occurred.

### ADVISEMENT OF *MIRANDA* RIGHTS

A person is in custody for purposes of *Miranda* when there is a formal arrest or a restraint on one's freedom of movement to the degree associated with such an arrest. *Id*. Persons temporarily detained pursuant to an investigatory traffic stop are not "in custody" for the purpose of *Miranda*. *State v. Casillas*, 279 Neb. 820, 782 N.W.2d 882 (2010). Temporarily detaining a driver to submit to routine field sobriety tests does not ordinarily rise to the level of custody so as to implicate *Miranda. Id.* The results of field sobriety tests are not testimonial in nature, and *Miranda* warnings are not required before field sobriety tests are administered. *Pickinpaugh, supra*.

The county court did not err in finding that Remijio was not in custody prior to being advised of the *Miranda* rights. Therefore, incriminating statements made by Remijio during the initial noncustodial encounter were not protected by the Fourth Amendment and were admissible at trial. Further, the results of the field sobriety tests were admissible.

Remijio's assignment of error is without merit.

### CONCLUSION

Upon our review, we find the district court sitting as an intermediate appellate court correctly concluded that the county court did not err in overruling Remijio's motion to suppress. Therefore, we affirm.

AFFIRMED.